**AD ART, INC., Petitioner**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondents.**

No. 78–3371.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 14, 1980.

Submitted May 22, 1980.

Decided Dec. 9, 1980.

As Amended Jan. 30, 1981.

Archie G. Parker, Rowland & Parker, Sacramento, Cal., for petitioner.

J. Keith Gorham, Washington, D.C., for respondent.

Before THORNBERRY,* ANDERSON and SKOPIL, Circuit Judges.

SKOPIL, Circuit Judge.

## INTRODUCTION

Ad Art, Inc. (Ad Art) petitions for review of a decision of the National Labor Relations Board (NLRB), 238 NLRB 159 (1978). The Board cross–applies for enforcement of its order.

This controversy arose when Ad Art discharged one of its employees. The union grieved the discharge under the collective bargaining agreement and pursued it through arbitration. An arbitrator found that the discharge was "just and lawful" under the collective bargaining agreement. The NLRB refused to defer to the arbitrator's decision. The Board found that Ad Art violated section 8(a)(1), 29 U.S.C. § 158(a)(1), by discharging the employee for exercising protected rights.

Ad Art argues that the Board abused its discretion in refusing to defer to the arbitral award. It further argues that if the refusal was proper, the Board failed to find an unlawful motivation for the discharge.

We enforce the Board's order.

## FACTS

The facts are complex but largely undisputed. Ad Art manufactures and services electric signs in California and Nevada. James Wydner was employed by Ad Art for fifteen years prior to his discharge in December 1976. The events culminating in his discharge covered several years, but for purposes of this review, we need only examine selected events.

In April 1976, after the expiration of a bargaining agreement, Ad Art and the International Brotherhood of Electrical Workers, Local Union No. 591 (union) engaged in intense bargaining. For the first time, the proposed agreement included provisions for seniority, job posting, paid holidays, vacations, sick leave and discharge only for just cause. When negotiations failed, the union engaged in a five–week strike.

Wydner vocally objected to a company offer to settle the labor dispute. The union membership, however, voted to accept the agreement and commence work. Wydner failed to return to work the first day. Ad Art considered his absence to be a "voluntary termination" but offered to listen to excuses and to consider re–employing him. Four other employees were similarly treated.

Wydner and the other four refused to meet with Ad Art President Lou Papais until a representative of the union was present. Papais ordered the five to leave the plant. Late that afternoon, they were called back and reinstated. The following day, Wydner was demoted a grade but his pay did not change. Shortly thereafter, the five employees filed a grievance requesting pay for the day they were ordered off the plant. Papais denied the grievance and reduced Wydner's pay to reflect the lower grade. Wydner filed a grievance over this pay reduction. The one–day pay grievance was eventually settled when Ad Art agreed to pay the employees the equivalent of six hours work. Eventually, Wydner's wage rate grievance was settled when Ad Art offered to promote him and raise his pay.[1]

In June 1976, Ad Art requested that employees work overtime. Wydner inquired whether the contract provided for mandatory overtime. Ad Art responded that overtime was not mandatory but insisted on voluntary compliance. Wydner worked overtime but only after the company indi-

---

* The Honorable Homer Thornberry, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. Wydner also filed an unfair labor practice with the Board alleging that Ad Art had discri-

minated against him because of his union membership and activities. The charge was withdrawn as part of a compromise over the rate grievance.

cated that disciplinary action would be initiated if he refused.

In July 1976, Wydner requested a meeting with Papais to discuss working conditions, grievances, and alleged harassment. Papais declined to meet with him and directed Wydner to submit complaints through a union steward. Papais took the opportunity to reprimand Wydner for his past activities of "improperly acting in the capacity of a steward", "meddling", and being "involved in matters that are none of [his] business."

During the summer, Wydner was involved in two incidents of poor workmanship. He failed to equip fully a sign before it was shipped out. He also failed to finish welding one sign because of a work–related injury. Wydner left the sign in the paint aisle. The sign was painted and sent to a customer where it eventually fell apart. Wydner refused to repair the sign on his own time. He was discharged but immediately rehired.

Wydner filed several more grievances through the union steward. Ad Art posted a notice in the plant notifying employees that the union was the recognized bargaining agent and direct bargaining negotiations with Ad Art were prohibited. Wydner complained that the union steward failed to file one of his grievances. The union representative began processing Wydner's grievances.

In November 1976, Wydner suffered a job–related injury and was unable to work the following day. Ad Art issued a written reprimand when Wydner did not work or call the company. Wydner filed a grievance over the reprimand.

In December 1976, a power outage occurred in the plant. A supervisor told some of the employees that "[a]s far as I'm concerned, if you don't want to work you can punch out and go home". Wydner was the only employee to leave. Power was restored later the same day. Ad Art refused to pay Wydner a full wage for that day. Wydner filed a grievance. It was written by a union steward and filed by the union. Papais denied the grievance but forgot to sign his reply. Wydner pointed this out to a steward who spoke with an Ad Art supervisor. They concluded that a signature was not required and told Wydner. Wydner took the reply and said that he would take care of it.

Wydner went to the office area and asked for Papais. The plant superintendent replied that he did not know where Papais was and shrugged when Wydner asked if Papais was in a particular office. Wydner proceeded into that office, interrupted a meeting, and asked Papais to sign the reply. Papais signed the reply. Wydner then commented, "I thought we were going to work these things out." Papais requested Wydner to leave.

The following day, December 23, 1976, Papais terminated Wydner's employment with Ad Art. In the termination notice, Papais recounted the events of the preceding day and interpreted Wydner's remark as an "implied threat" that was "just another example of [Wydner's] poor attitude and the negative effect it has on the other workers." Papais also reviewed the power outage grievance and mentioned several other grievances, some of which had long been settled. Papais stressed Wydner's persistence in seeking his own solutions to complaints and doing so on company time. The letter concluded that Wydner's "continued actions and activities prove that [he was] not the productive worker that the company is entitled to expect and that [he was] more interested in making trouble ...."

Shortly thereafter, Wydner filed a grievance charging that he was terminated for unjust reasons. He also filed an unfair labor practice charge with the NLRB. The union pursued the grievance to arbitration. The unfair labor charge was withdrawn "without prejudice" pending the arbitration.

On May 24, 1977 the arbitration hearing was conducted. Several days later, to avoid a six–month filing limitation, Wydner refiled the unfair labor practice charge with the NLRB. On July 12, the arbitral decision was released. The arbitrator found

that Ad Art had "just cause" to dismiss Wydner. Specifically, the arbitrator found that when Wydner interrupted the meeting he was "in effect acting like a steward although he was warned on more than one occasion not to do so." The arbitrator determined that Ad Art had the authority under the bargaining agreement to direct the work force and to discharge employees for "just and lawful cause." Although Wydner had performed his job satisfactorily for many years, he did not have the right to "disregard reasonable Company rules which he did on numerous occasions".

The Administrative Law Judge (ALJ), after reviewing the arbitrator's decision, recommended that the NLRB refuse to defer to the arbitral decision. The ALJ stated that it was not sufficient for the arbitrator to deal merely with the question of whether or not the discharge was proper under the contract. He found that the arbitrator did not have before him and did not decide the statutory basis for an unfair labor practice. The ALJ concluded that although Wydner displayed a bad attitude and often confronted management over trivial matters, Ad Art violated section 8(a)(1) by discharging Wydner for exercising his section 7 right to engage in the concerted protected activity of filing grievances. The ALJ found, however, that Ad Art did not violate section 8(a)(4) and found it unnecessary to determine if a section 8(a)(3) violation occurred.

The Board, with one member dissenting, adopted the ALJ's recommendation not to defer to the arbitral award. The Board also adopted the findings of the ALJ and the conclusion that Ad Art committed an unfair labor practice by discharging Wydner. The Board's proposed order instructed Ad Art to cease and desist from discharging employees who exercise protected rights, offer Wydner full reinstatement without prejudice to seniority, pay back wages for the time he lost and post appropriate notices.

## ISSUES

1. Did the NLRB abuse its discretion by refusing to defer to the arbitrator's decision?

2. If the Board's deferral decision was not an abuse of discretion, is there substantial evidence in the record to support the Board conclusion that Wydner was unlawfully discharged?

## DISCUSSION

### I. Deferral to Arbitration

This circuit recently addressed the "troublesome issue of whether, and under what circumstances, the Board's refusal to defer to an arbitral award should be upheld." *NLRB v. Max Factor and Co.*, 640 F.2d 197 (9th Cir. 1980). Resolution of the issue requires an accommodation of two competing policies. *Id.* at 201. One policy favors exercise of the Board's jurisdiction to prevent unfair labor practices. The other policy favors settlement of labor disputes through arbitration. *See Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1973); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

We have long recognized that the task of accommodating these competing interests falls first on the National Labor Relations Board. The Board is provided with statutory authority under section 10(a), 29 U.S.C. § 160(a), to adjudicate and remedy unfair labor practices. That authority is not affected by other means of adjustment established by agreement including arbitration. *NLRB v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1968). Although the presence of arbitration machinery does not oust NLRB jurisdiction, the Board has considerable discretion to accept an arbitrator's award and decline to exercise authority over an alleged unfair labor practice. *Stephenson v. NLRB*, 550 F.2d 535, 537 (9th Cir. 1977). Our review of the Board's decision is limited to determining if the Board abused its discretion. *Hawaiian Hauling Service, Ltd. v. NLRB*, 545

F.2d 674, 676 (9th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977). The Board only abuses its wide discretion if it fails to follow its own deferral standards or if the standards themselves are invalid. *Id. See also Max Factor, supra,* at 201, *NLRB v. Safeway Stores, Inc.,* 622 F.2d 425, 428 (9th Cir. 1980); *NLRB v. Pincus Brothers, Inc.–Maxwell,* 620 F.2d 367, 372 (3d Cir. 1980); *Alfred M. Lewis, Inc. v. NLRB,* 587 F.2d 403, 407 (9th Cir. 1978).

The Board's deferral standards were first articulated in *Spielberg Manufacturing Co.,* 112 NLRB 1080 (1955), and clarified in *International Harvester Co.,* 138 NLRB 923, *enforced sub nom., Ramsey v. NLRB,* 327 F.2d 784 (7th Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). The Board will defer to an arbitration decision if (1) the arbitration proceedings appear to have been fair and regular; (2) all parties agreed to be bound; and (3) the arbitrator's decision was not clearly repugnant to the purpose and policies of the National Labor Relations Act. The *Spielberg* doctrine was endorsed by the Supreme Court in *Carey v. Westinghouse Corp.,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).

■ The Board later redefined its policy by refusing to defer to an award even though the *Spielberg* requirements had been satisfied.[2] The Board concluded that deferral was not proper unless the unfair labor practice issue was both presented to and acted upon by the arbitrator. *Yourga Trucking Inc.,* 197 NLRB 928 (1972); *Airco Industrial Cases,* 195 NLRB 676 (1972).

This policy was soon overruled by the Board in *Electronics Reproduction Service Corp.,* 213 NLRB 748 (1974). In that case the Board recognized that parties were purposely withholding evidence of unfair labor practices before the arbitrator to assure a second hearing before the Board. To foreclose this "second bite of the apple" the Board declared that it would defer to an arbitral award even with no indication that the unfair labor practice issue had been presented to or decided by the arbitrator.[3]

The Board's extension of *Spielberg* through *Electronics Reproduction* met with judicial resistance. In *Banyard v. NLRB,* 505 F.2d 342 (D.C. Cir. 1974), the D.C. Circuit found that the Board abused its discretion in deferring to an arbitral award when (1) there was no indication that the arbitral tribunal clearly decided the unfair labor practice and; (2) there was no evidence that the arbitral tribunal decided an issue within its competence. These two additional limitations on the Board's discretion to defer to an arbitration award were approved and adopted by the Ninth Circuit in *Stephenson v. NLRB,* 550 F.2d 535, 538 (9th Cir. 1977).[4]

■ Recognizing the resistance to its policy formulated in *Electronics Reproduction,* the Board recently overruled the case. *Suburban Motor Freight, Inc.,* 247 NLRB No. 2, 102 LRRM 1113 (1980). The Board found that although *Electronics Reproduction* promoted the statutory purpose of encouraging collective bargaining relationships, it also derogated the equally important purpose of protecting employees in the

2. The Board may change its deference criteria without engaging in conduct which a court would find to be an abuse of discretion. The Board cannot, however, announce a new policy regarding deference to arbitration and then ignore it thereby leading astray litigants who depended upon it. *NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 679 (2d Cir. 1971).

3. Recognizing exceptions to the rule, the Board stated it would not defer if (1) the arbitration clause was not broad enough to include the unfair labor practice; or (2) the arbitrator was clearly unwilling or unable to decide the statutory issue.

4. There has been some criticism of the *Banyard* criteria. *See* R. Garmon, Labor Law 742 (1976); *Recent Cases, Banyard v. NLRB,* 88 Harv.L.Rev. 804 (1975). In addition, the need for the *Stephenson* majority to adopt the *Banyard* criteria has been questioned. *NLRB v. Max Factor, supra,* at 203 n.6. In *Max Factor* this court speculated that rejection of the *Electronics Reproduction* presumption did not require adoption of the *Banyard* criteria. Moreover, this court was unable to determine any useful purpose for precluding deferral because of uncertainty about whether the arbitrator intended to decide the statutory issues as long as the award was not clearly repugnant to the Act. *Id.*

exercise of protected section 7 rights. The Board found that it could no longer adhere to a doctrine which forced employees in arbitration proceedings to seek simultaneous vindication of their private contractual rights and public statutory rights or risk waiving the latter. In specific terms, the Board declared that it "will no longer honor the results of an arbitration proceeding under *Spielberg* unless the unfair labor practice issue before the Board was both presented to and considered by the arbitrator". The party seeking deferral has the burden of proving that the statutory issues were before the arbitrator. *Suburban Motor Freight, Inc.*, 102 LRRM at 1114. The Board apparently recognized that the union's interest in arbitration may not coincide with that of the individual, and that the *Electronics Reproduction* policy in some instances deprived individuals of statutory rights under the guise of encouraging private dispute resolution.[5]

In this case the ALJ applied the pre–*Electronics Reproduction* analysis. He found that it was the Board's policy to defer to arbitration only if the arbitral proceedings were "fair and regular" and "not clearly repugnant to the policies of the Act." In determining whether or not this arbitral proceeding met these *Spielberg* standards, the ALJ sought to determine whether the arbitrator was presented with the statutory issues under the Act. His review of the arbitration transcript and the arbitral decision disclosed that the arbitrator did not have before him and did not decide the statutory question. On that basis the ALJ refused to defer to the arbitral award.

The Board, with a dissenting member, adopted the recommendation of the ALJ to not defer to the arbitration award. The majority found that the arbitration proceedings did not meet the *Spielberg* criteria because the arbitrator never considered if Wydner's activities were protected under section 7 of the Act.

The dissent viewed the arbitral issue not to be whether Wydner was discharged for exercising protected activity but whether the totality of his conduct crossed over the line of protected activity so as to constitute just cause for his discharge. The dissent interpreted the arbitrator's decision to hold that Wydner's activities were beyond the protection of the Act. The dissent therefore found that the Board improperly substituted its factual judgment for that of the arbitrator.

■ When an unfair labor practice rests on factual issues of contract interpretation, the arbitrator may be in a superior position to resolve the merits of the unfair labor practice. *See Bloom v. NLRB*, 603 F.2d 1015, 1020 (D.C.Cir.1979). Similarly, where resolution of the unfair labor practice charge involves mainly factual, as opposed to statutory, issues the arbitrator's decision should not be ignored by the Board. *Stephenson v. NLRB*, 550 F.2d at 538 n.4. The Board's dissent characterized the controversy as mainly a factual issue of whether or not the totality of Wydner's activity crossed the line of protection under the Act. If that characterization is accurate the Board may, under the *Spielberg* criteria, be obligated to defer to the arbitrator's decision. *NLRB v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367, 375 (3d Cir. 1980).

■ In *Pincus Brothers*, the Board was found to have abused its discretion in refusing to defer to an arbitrator's decision. The arbitrator found that the employee was terminated for "cause". The Board determined that her activity was protected by

---

5. One result of this return to pre–*Electronics Reproduction* deference policy is that parties may again withhold their statutory claims from the arbitrator to gain a second review by the Board. We are troubled with this possibility. When the statutory claim is incapable of being alleged as a contractual breach, we believe that a twofold review is proper. When, however, the alleged contractual breach is capable of being alleged as a statutory breach and the arbitral award resolves both, deference seems proper even if evidence of the statutory violation was not presented to the arbitrator. We decline, however, to formulate rules for the Board to follow in making its deference decision. That responsibility is placed in the first instance squarely upon the Board.

section 7 and refused to defer. The court held that the employee's activity was arguably unprotected. Therefore the Board could not refuse to defer to the arbitrator's decision since the result was not "clearly repugnant" to the Act.[6] This circuit has declined, however, to follow the holding in *Pincus Brothers. NLRB v. Max Factor Co.,* *supra,* at 204 n.7. We questioned the court's authority to interpret the Board's self–imposed *Spielberg* criteria differently than the Board. Foremost, however, we found that enforcing the Act's protections may be important enough to outweigh the interest in encouraging arbitration, even in cases where the conduct is arguably unprotected. *Id.* Therefore, even if we accept the dissent's view that the controversy was mainly factual, we are unable to conclude that the Board abused its wide discretion in refusing to defer to the arbitration decision. When the Board determines that an arbitrator failed to consider statutory issues and the resultant decision differs from one appropriate under the Act, the Board may, within its discretion, elect to exercise its authority over the unfair labor practice charge and refuse to defer to the arbitral award. *See Max Factor, supra,* at 204.

Ad Art argues that the Board abused its discretion in accepting the ALJ's conclusion that the arbitrator did not apply any statutory measure to his analysis and that therefore the award was repugnant to the policy and purposes of the Act. Ad Art argues that there is "no doubt" that evidence of the section 8(a)(1) violation was presented.

Although the arbitral award does not specifically refer to the Act, Ad Art argues that the arbitrator's analysis and comments shows that he considered the statutory issues.

The "clearly decided" requirement[7] means that the arbitrator's decision must specifically deal with the statutory issue. *Stephenson v. NLRB,* 550 F.2d 535, 538 n.4 (9th Cir. 1977). This means that the arbitrator must be presented with the statutory issue and adequately consider it as a basis for the decision. It is not necessary, however, for the arbitrator expressly to review the statutory issue in a written memorandum. *Bloom v. NLRB,* 603 F.2d 1015, 1021 (D.C. Cir. 1979). If there is "substantial and definite proof" that the unfair labor practice issue was presented and the arbitral decision indisputably resolves that issue, then the "clearly decided" requirement is met. *Stephenson, supra* at 538 n.4.

We find in our review of the arbitration transcript and the arbitral award substantial evidence to support the Board's conclusion that the arbitrator was not clearly presented with and did not clearly decide the unfair labor practice issue. No mention is made in the proceedings of the statutory protections provided by section 7 of the Act. The Board properly found that the arbitral award does not reflect any analysis of the statutory protections. The Board's refusal to defer was therefore proper and certainly not an abuse of discretion.[8]

**6.** The *Pincus Brothers* relied on our opinion in *Douglas Aircraft Co. v. NLRB,* 609 F.2d 352 (9th Cir. 1979). In that case, we set aside the Board's refusal to defer to an arbitration decision that was based on two grounds, one permissible and one impermissible under the Act. We held that the Board could not disregard the permissible ground in making its deferral decision since the award on that basis was not "clearly repugnant" to the Act.

**7.** This requirement was added as a further limitation on the Board's discretion by our holding in *Stephenson v. NLRB, supra.* It can be viewed as an independent requirement as *Stephenson* clearly intended. It can also be viewed, however, as an extension of the already existing *Spielberg* criteria, particularly

whether the proceedings were fair and regular and whether the result was repugnant to the Act. The Board apparently applied the requirement from the latter perspective. We find no fault with this interpretation.

**8.** Ad Art also argues that the Board should be required to defer to the arbitral award on estoppel principles. Rapais testified that he believed that the arbitration proceedings were final and that the Board failed to explain that when Wydner's unfair labor charge was withdrawn "without prejudice", it could be refiled. Ad Art admits that it found no precedent support for such an estoppel theory. The Board found the argument to be "feckless and unpersuasive". We agree with the Board's conclusion.

## II. Unlawful Motive

 Ad Art was found by the Board to have committed an unfair labor practice in violation of section 8(a)(1). That section prohibits employers from interfering with, restraining, or coercing employees who exercise rights guaranteed by section 7. The filing of grievances is a protected right under the Act. *NLRB v. H. C. Smith Construction Co.*, 439 F.2d 1064 (9th Cir. 1971). An employer commits an unfair labor practice when it discharges an employee who seeks, with the aid of the union or fellow employees, to grieve complaints. *E.g.*, *NLRB v. Lantz*, 607 F.2d 290, 298–99 (9th Cir. 1979); *Allen v. NLRB*, 561 F.2d 976 (D.C. Cir. 1977); *NLRB v. Victor Otlans Roofing Corp.*, 445 F.2d 299 (9th Cir. 1971).

Ad Art challenges the Board's conclusion that it discharged Wydner because he exercised protected activities. The challenge is two–fold: (1) Ad Art claims that it recognized Wydner's right to file grievances, but disapproved of his insistence to "process" them; and (2) the Board failed to apply the proper standard to determine if Ad Art had an unlawful motive for discharging Wydner.

The ALJ found that Wydner filed numerous grievances, most of which had some merit. Although the ALJ detailed much of Wydner's grievance activity, the decision does not specifically disclose whether Wydner attempted to usurp the powers of a union steward by processing his own complaints. Our review of the record, however, shows that Wydner typically filed and processed grievances through a steward. His requested meeting with Papais to discuss working conditions is an exception, although the meeting was not predicated on any outstanding grievances. Wydner's interruption of a meeting to secure Papais's signature was undoubtedly unnecessary but alone does not establish that Wydner demonstrated a pattern of processing his own complaints. We reject Ad Art's first challenge to the Board's conclusion.

 To support a finding that an employer committed an unfair labor practice, there must be an affirmative showing of unlawful motivation either to discourage union membership or to interfere with the exercise of protected rights.[9] *Portland Willamette Co. v. NLRB*, 534 F.2d 1331 (9th Cir. 1976). When a discharge is conceivably motivated both by legitimate business considerations and protected union activity, the test is whether the business reason or the protected union activity is the moving cause behind the discharge. *Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 (9th Cir. 1977). Stated conversely, "where a party has two motives, one permissible and the other impermissible, ... the improper motive must be shown to be the dominant one".[10] *Id.* *See also L'Eggs Products Inc. v. NLRB*, 619 F.2d 1337, 1341–42 (9th Cir. 1980).

The Board in this case adopted the ALJ's findings that Ad Art was "in large part" and "in large measure" motivated to dis-

---

9. In some instances, unlawful motivation is presumed to exist and no proof is necessary. *NLRB v. Great Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). For example, when an employer's actions are "inherently destructive" of employees' section 7 rights, proof of antiunion animus is not necessary. *E.g., NLRB v. Lantz*, 607 F.2d 290, 299 (9th Cir. 1979). Actions which are inherently destructive include those that may hinder future bargaining, or those which discriminate against employees solely on the basis of union participation. *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). The isolated discharge of a single employee is not, however, action "inherently destructive" of section 7 rights. *Western Exterminator v. NLRB*, 565 F.2d 1114, 1117 n.2 (9th Cir. 1977).

10. Ad Art correctly notes that this motivation standard applies to alleged violations of section 8(a)(3), 29 U.S.C. § 158(a)(3), and not necessarily to section 8(a)(1) violations. In fact, Ad Art argues that the Board dropped the section 8(a)(3) charge to avoid the necessity of proving that the dominant motive was unlawful. We find, however, that antiunion discharges are routinely prosecuted under different subsections of the Act, any of which may establish them as unfair labor practices. Although obvious differences in language exist between the various subsections, for purposes of our review in this case, we will assume the need for an antiunion animus showing is the same.

charge Wydner for his grievance filing activity. Ad Art argues that this is not the correct standard and that the Board, to find an unfair labor practice, must show that Ad Art's "dominant motive" was unlawful.

 We reject Ad Art's argument that the Board utilized an incorrect standard to measure anti-union animus. In describing the dominant and moving cause of a discharge, the Board is not required to use particular language in its findings in each case. In this case it has not been demonstrated that there is a meaningful difference between the Board's finding that the discharge was "in large measure" or "in large part" unlawfully motivated and a finding that the dominant motive was unlawful.

To enforce the Board's order we must determine if there is substantial evidence in the record to support the Board's findings. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951). The Board accepted the ALJ's finding that Wydner was discharged "in large measure" for filing grievances. The ALJ relied heavily on Papais's termination letter to Wydner to reach his conclusion. That letter attacks the merits of the power outage grievance and makes references to many of Wydner's earlier grievances. It also refers to Wydner's work mistakes, poor attitude and uncooperative behavior.

 An employer may discharge an employee for good cause, bad cause, or no cause at all without violating the Act as long as the employer's motive is not unlawful and the discharge does not punish activities protected by the Act. *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1341 (9th Cir. 1980). An employee cannot hide behind the cloak of unionism for insubordination that would not be tolerated from others. *E.g.,*

*Stein Seal Co. v. NLRB*, 605 F.2d 703, 709 (3d Cir. 1979). The line between an employer's right to maintain order and the employee's right to engage in protected activity must initially be drawn by the Board. In drawing that line, the Board may rely on circumstantial as well as direct evidence to determine whether the employer's action was based on an unlawful motive. *NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1369 (9th Cir. 1969). We may not substitute our view for the Board's choice between conflicting views, even though we might justifiably have made a different choice if the matter was presented to us *de novo. NLRB v. Miller Redwood Co., supra* at 1369.

 We agree with the ALJ that Wydner's behavior was troubling.[11] Nonetheless, "the fact that the Board's choice is one of two conflicting alternatives and that evidence and inferences exist to support the rejected choice is not a sufficient ground for refusing to order enforcement." *NLRB v. Holly Bra of California, Inc.*, 405 F.2d 870, 872 (9th Cir. 1969). We find, therefore, that there is substantial evidence in the record taken as a whole to support the Board's finding that Wydner was discharged "in large measure" for exercising protected activities.

### CONCLUSION

Ad Art seeks review of the Board's finding that it committed an unfair labor practice by discharging James Wydner. The Board cross–applies for enforcement of its order. We hold that the Board did not abuse its discretion in refusing to defer to the decision of the arbitrator. We find substantial evidence in the record viewed as a whole to support the Board's finding that Ad Art violated section 8(a)(1) by discharging Wydner for exercising his protected rights.

Ad Art's petition for review is denied. We enforce the Board's order.

---

11. The ALJ found that Wydner sometimes displayed a bad work attitude. Wydner falsely accused management of harassment and the union of failing adequately to represent his interests. He grudgingly worked overtime, made several careless work errors and "displayed uncommonly bad manners and judg- ment in ignoring his steward's advice" in confronting Papais to obtain a signature on the grievance reply. Nevertheless, the ALJ found that although Wydner's conduct approached the point of not being protected, it did not reach it.