NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MAGNETICS INTERNATIONAL,
INC., Respondent.

No. 81–1435.

United States Court of Appeals,
Sixth Circuit.

Argued July 27, 1982.

Decided Feb. 1, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, Marjorie Gofreed (argued), N.L.R.B., Washington, D.C., for petitioner.

Donald N. Jaffe (argued), Persky, Marken, Konigsberg & Shapiro, Cleveland, Ohio, for respondent.

Before KEITH, MERRITT and JONES, Circuit Judges.

KEITH, Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of its January 14, 1981 order against Respondent Magnetics International, Inc., ("Company"). The Company cross-petitions for review of the Board's findings of fact and conclusion that it violated section 8(a)(1) and (3) of the National Labor Relations Act ("Act"). The decision and order of the Board are reported at 254 N.L.R.B. 520 (1981). For the reasons set forth below, we grant enforcement of the Board's order.

I.

Magnetics International is an Ohio corporation located in Maple Heights, Ohio. It is engaged in the manufacture of electric motors and lifting magnetics. It ships more than $50,000 of its products directly to points outside Ohio each year.

The International Association of Machinists and Aerospace Workers ("Union") is the bargaining agent for the hourly employees of the Company. The 1977–80 collective bargaining agreement between the Company and the Union provided, in part, for a six-person shop committee headed by a chief shop steward. The remaining five committee members were to be department committee members.

In 1972, the Company hired Vivian Knutson, the Charging Party, as an armature connector in its production-maintenance department. During her first five years of employment, Knutson received twelve merit increases and was issued only one disciplinary notice. In 1977 Knutson filed a sex discrimination action against the Company in the United States District Court for the Northern District of Ohio.

On December 13, 1977, Knutson was called into a meeting in the office of Steve Moskin, plant superintendent. Present at the meeting were Moskin; Frank Novey, the personnel manager; Frank Baka, Knutson's foreman; Florence Gallicky, chief shop steward; and Elsie Nagy, secretary of the Union. Novey accused Knutson of circulating a petition to oust the Union from the Company. Knutson denied that she knew anything about such a petition. Novey then brought up the subject of Knutson's EEOC charges. He explained that she would not have been recalled from layoff had the Company not been under the impression she was dropping the suit. Finally, Novey objected to the number of calls Knutson was making to the Union Hall, indicating that many of the calls were being improperly made from the plant.

In January, 1978, Knutson was elected Committeewoman for her department. She was responsible for handling verbal as well as written grievances from hourly employees in her department, and assisting other union members in other departments. Though Committeepersons received overtime pay for time spent handling grievances, they often resolved disputes during worktime.

Shortly after her election as Committeewoman in 1978, Knutson began filing written grievances over work assignments and overtime assignments. As department steward, she was entitled to work overtime when five or more members of her department were working overtime. This right was conditioned only upon her being capable of performing the work. The Company responded to Knutson's grievances by asserting that union representation was already present, and that Knutson was not experienced in performing the work being done.

All of the grievances filed by Knutson between January and June of 1978 named her as the aggrieved employee except one filed February 10. In the February 10 written grievance, Knutson accused Foreman Baka of, *inter alia,* harassing her and other union employees, causing tension in the department, disrupting and slowing down production, and denying employees their union and human rights. All of the grievances filed by Knutson during this six month period were resolved through the Company's internal grievance procedure.

## JUNE 8 SUSPENSION

On June 8, two employees from Knutson's department complained to her that a new employee, Pat Stevens, was performing three job functions at one time. The employees argued that this was a violation of the collective bargaining agreement between the Union and the Company. Knutson agreed, and went to Stevens' work station to speak to her. According to Knutson:

> I asked if she had orders from the working supervisor, Mr. Eddy Biala, to perform all three jobs. She didn't give me an answer, and I says, "You are a new girl and you are not allowed to run three jobs in one and another classifications. The girls are complaining."

Stevens made no comment, and Knutson returned to her work station.

Shortly thereafter, Baka came to see Knutson at her station. What occurred afterwards is a matter of some dispute. According to Knutson, Baka wanted to discuss

a disciplinary warning that had been given to another employee on the previous day. Knutson told Baka that she considered the matter closed, since the employee had not been afforded his right to union representation. According to Baka, he had seen and overheard Knutson tell Pat Stevens not to do the job she had been assigned.

Whatever the topic of conversation, it soon escalated into a heated argument. It ended with Baka telling Knutson to "hit the damned bricks." Knutson refused to leave without union representation. After much commotion and a discussion involving other Union and Company officials, Knutson was indefinitely suspended for (1) interfering with, talking with, or otherwise disturbing employees either within or outside of her own department, (2) willful disregard for the rights of other employees, (3) insubordination or the refusal to carry out orders of the foreman or other supervisor, and (4) organizing, promoting, and/or participating in an authorized work stoppage or slow down.

Knutson filed a grievance in which she charged that she had been unjustly accused and unfairly disciplined. Her indefinite suspension was modified to three days before the grievance procedure reached the second step.

### JUNE 27 DISCIPLINARY NOTICE

On June 26, Knutson was absent from work. When she returned on June 27, she was given a disciplinary notice for excessive absenteeism. The dates in question were April 6, 12, 25; May 22, 23, 25, 30; and June 26. On April 6, Knutson was at her attorney's office where the attorney was taking the deposition of Frank Novey in connection with Knutson's sex discrimination action. On April 12, Knutson was having her own deposition taken by Company's counsel. The Company was aware of both events.

Knutson was ill on May 22, 23 and 25. She brought in a doctor's excuse which the Company refused to accept. Pursuant to the collective bargaining agreement, the Company automatically places all employees who accumulate five consecutive absences while under medical care on sick leave. All other absences, even with a doctor's excuse, are counted against the employee.

The Company did not selectively enforce this rule against Knutson. But there is some question whether the Company's attempt to penalize Knutson by counting the absences on April 2 and April 12 against her were improper.

### JULY 12 DISCHARGE

On July 11, Knutson received an oral complaint from Jeannie Moss. Moss questioned whether the Company had the right to unilaterally make a temporary job transfer. Knutson informed her that it did. When Moss disagreed, Knutson looked it up in the contract book which set out the terms of the collective bargaining agreement between the Company and the Union.

Baka and Moskin saw Knutson reading the contract book, but said nothing. A few minutes later, Baka returned to Knutson's work station and handed her a disciplinary notice. The notice stated that Knutson was being disciplined for loafing on the job and reading personal material during productive time. Knutson stated that she took the disciplinary notice and said nothing, but Baka wrote on the back of the warning notice, "At issuance of this citation V. Knutson said 'One of these days, big boy, your (sic) not going to make it home (sic).' No witnesses present."

Baka immediately went to inform his superiors, Garman and Moskin, that he had been threatened. They decided Knutson would be indefinitely suspended for threatening Baka, pending an investigation of the incident. By the time this decision was made, Knutson had already left the plant for the day.

On the evening of July 11, a car tried to force Baka off the highway. He reported this to police authorities immediately. The following morning, he reported it to Garman and Moskin. Knutson did not come to work on July 12, because she was ill. Garman called her at home to inform her that she had been suspended.

Garman and Moskin presented conflicting testimony as to whether Baka's highway incident had anything to do with the subsequent decision to fire Knutson. Garman stated that the accident Baka reported having on July 11 had nothing to do with the decision to fire Knutson. But Moskin testified as follows:

> Well, the final conclusion came when the foreman reported the next day that somebody tried to run him off the road. We thought, we're not dealing with somebody who is making idle threats anymore, somebody is really taking steps against the foreman.

On July 22, Knutson was informed that she was being discharged for threatening the life of Frank Baka. On October 3, 1978, Knutson's challenge to the discharge came before an arbitrator pursuant to the collective bargaining agreement between the Union and the Company. The arbitrator concluded that the Company had just contractual cause for discharging Knutson.

Knutson subsequently filed charges with the Board. On November 13, 1978, the General Counsel issued a complaint alleging that the Company's disciplinary actions against Knutson on June 8, June 26, and July 11 were taken because of her activities as a Union Committeewoman. A hearing was held on this matter on May 24, 1979 before an Administrative Law Judge ("ALJ"). The ALJ found that the Company's disciplinary actions had been caused in part by Knutson's union activities. He recommended that Knutson be reinstated, that she be made whole for all injuries suffered because of the unlawful discharge, and that the Company be required to post a notice at its place of business. The Board adopted the findings and conclusions of the ALJ in an order dated January 14, 1981.

The Board now seeks enforcement of its order and the Company appeals from the Board's order. The questions on this appeal are: 1) whether the Board erred in refusing to defer to the decision of the arbitrator, and 2) if not, whether there is substantial evidence to support the Board's decision.

## DEFERRAL ISSUE

The threshold issue on appeal is whether the Board erred in refusing to defer to the arbitrator's decision. The Company contends that the arbitrator necessarily had to consider Knutson's unfair labor practice charges since he decided that there was just contractual cause for her discharge. It argues that the Board's refusal to defer gives her a second opportunity to litigate the unfair labor practice issue and is thus inimical to the favored policy of settling labor disputes through arbitration. We disagree.

In *John Klann Moving and Trucking Company v. NLRB,* 411 F.2d 261 (6th Cir.), *cert. denied* 396 U.S. 833, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969), this Circuit noted that the Board's policy of deferring to an arbitrator's award when the *Spielberg* criteria were met was discretionary. We approved the use of the *Spielberg* criteria which required: 1) all parties agree to be bound by arbitration; 2) the arbitration proceedings be fair and regular; and 3) the arbitrator's award not be repugnant to the policies of the Act. *See Spielberg Manufacturing Company,* 112 N.L.R.B. 1080 (1955). But we added, "it would also appear that the Board may look behind an arbitrator's award where the arbitrator did not consider the specific factor which results in the unfair labor practice." *John Klann* at 263.

The Supreme Court has also sanctioned the Board's deferral policy under the *Spielberg* criteria. But it has noted that the Board's authority to adjudicate unfair labor practices is clear. *See Carey v. Westinghouse Corp.,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1974). Thus arbitration is properly seen as an aid to the Board in settling labor disputes, not as an alternative to its processes.

Several courts of appeals have analyzed the relationship between arbitration awards and the Board's responsibility to adjudicate unfair labor practice charges. The clear weight of authority holds that the Board should not defer in the absence of evidence that the arbitrator has resolved the unfair labor practice charge and that the *Spielberg* criteria have been met.

In *Banyard v. NLRB,* 505 F.2d 342 (D.C. Cir.1974), the District of Columbia Circuit reviewed decisions by the Board to defer to an arbitrator's award. The court refused to sanction deferral in those cases, because it could not tell whether the arbitrator had considered the statutory issue involving unfair labor practice charges. The court reasoned that its acceptance of the Board's policy of deferral was premised upon an understanding that it would be applied only when the statutory issue and the contractual issue were essentially the same. Anything less, wrote the court, would be an abdication of the Board's statutory obligation to settle unfair labor practice disputes. *Id.* at 345.

The *Banyard* court added two requirements to the *Spielberg* criteria. First, it would defer only when the statutory issue and the contractual issue were congruent and it appeared from the award that the arbitrator had clearly decided the statutory issues. Second, the arbitrator must be competent to decide the unfair labor practice issues. *See also* 88 Harv.L.Rev. 804 (1975). Only when these requirements, in addition to the *Spielberg* criteria, were met, would the Board be free to defer to arbitration awards. *See, e.g., Bloom v. NLRB,* 603 F.2d 1015 (D.C.Cir.1979) (deferral appropriate where statutory issue and contractual issue are the same, arbitrator has the competence to decide the statutory issue, and all of the other *Spielberg* criteria are met).

The Ninth Circuit has analyzed the issue differently, but reached essentially the same results. In *Stephenson v. NLRB,* 550 F.2d 535, 537 (9th Cir.1977), the court held:

When the arbitration proceedings show a specific refusal to pass upon a statutory issue, the Board should not defer. Likewise, when the arbitrator does not consider the statutory issues, the Board should not do so (citations omitted). *A priori,* when it is impossible to determine what issues the arbitration panel has not considered, or if the arbitration panel has not considered the statutory issue fairly

and consistently with the precepts and purposes of the Act, then the Board should also not defer. (citations omitted).

The court explained that its decision rested upon the different purposes served by arbitration panels and the Board. An arbitration panel derives its authority from the "expressed commitment of the parties to the collective bargaining agreement and to the arbitration procedure incorporated therein." *Id.* at 539. On the other hand, the Board's authority is derived from the Act; the Board "is concerned with the prevention of unfair labor practices under the federal labor laws and is thus primarily concerned with the statutory and policy considerations." *Id.*

The *Stephenson* court concluded that the Board could not properly exercise its authority to defer when it is ignorant of the issues decided and the basis of the arbitrator's decision. Moreover, the court warned that it would be illogical to allow the Board to defer to an arbitrator's award merely on the presumption that the unfair labor practice issue had been resolved. Since the arbitrator or arbitration panel is not a branch of the Board, the Board should not presume that the issue has been decided in a manner consistent with the policies of the Act.

In *NLRB v. General Warehouse Corp.,* 643 F.2d 965, 969 (3d Cir.1981), the Third Circuit warned that "in order for the Board's policy of deferral not to be one of abdication, the Board must be presented with some evidence that the statutory issue has actually been decided." The court held that an employer may have just cause for firing an employee under the terms of a labor contract, but may actually fire an employee for illegal reasons. In the absence of evidence that the arbitrator decided whether the employee was fired because of the reasons asserted by the employer, the court held that it would not require the Board to stay its processes.

The policy considerations underlying these opinions by the Third, Ninth, and

District of Columbia circuits are compelling.[1] The adoption of a policy which collapsed the statutory issue into the contractual one would effectively ignore the congressional mandate of Sections 8(a)(1) and (3). The Act was designed to charter a federal policy in the area of employer-employee relations. The Board is the institution which was chosen to implement this policy. Arbitration pursuant to collective bargaining agreements is a device properly used to effectuate the purpose of minimizing industrial strife, not to supplant this national policy. *See Carey v. Westinghouse,* 375 U.S. at 266, 84 S.Ct. at 406.

Therefore, we will honor the Board's decision to defer only when it appears from the arbitrator's award that the arbitrator considered and clearly decided all unfair labor practice charges. We will not speculate about what the arbitrator must necessarily have considered. Rather, we will examine the arbitrator's award itself and the degree of congruence between the award and the charges brought under the statute.[2] While we will not require evidence that the unfair labor charge was presented and considered be in written form, any doubts regarding the propriety of deferral will be resolved against the party urging deferral.[3]

---

1. The Second Circuit's application of the Board's deferral policy appears to be consistent with that of the Third, Ninth, and District of Columbia Circuits. *See Liquor Salesmen's Union Local 2 v. NLRB,* 664 F.2d 318 (2d Cir. 1981), *cert. denied* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982) (citing *Stephenson v. NLRB,* 550 F.2d 535, n. 4 (9th Cir.1977)).

   The Seventh Circuit requires that the statutory issue be "clearly decided" before the Board is obligated to defer to an arbitrator's award. *St. Luke's Memorial Hospital, Inc. v. NLRB,* 623 F.2d 1173, 1178 (7th Cir.1980).

2. By so doing, we uphold the Board's policy as enunciated in *Suburban Motor Freight and Ralph Singleton,* 247 N.L.R.B. 146 (1980). We uphold the Board though we realize that its position on this issue has not always been consistent. *See Liquor Salesmen's Union Local 2 v. NLRB,* 664 F.2d at 323–24.

   The Board adopted its deferral policy in *Spielberg,* 112 N.L.R.B. 1080 (1955), in order to allow parties to agree to settle contractual labor issues without interference from the Board. In *Raytheon Company and Jane Reikard,* 140 N.L.R.B. 883 (1963), *enforcement denied on other grounds,* 326 F.2d 471 (1st Cir.1964), the Board refused to defer to an arbitrator's decision which found that the employer had just cause for dismissing employees for "tending to incite conduct in breach of a company rule." The Board found that the arbitrator had not considered whether the employee's actions were motivated by unfair labor practices by the employer; thus, the Board was obligated to consider the issue.

   In *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971), the Board stated its policy even more clearly. It would not defer unless the unfair labor practice issue was both presented to and considered by the arbitrator. The *Collyer* position was reiterated and embellished in *Airco Industrial Gases,* 195 N.L.R.B. 676 (1972) (deferral not appropriate where there is no indication from the award that the arbitrator considered the unfair labor practice) and *Yourga*

*Trucking, Inc.,* 197 N.L.R.B. 928 (1972) (burden of proving statutory issue was decided rests with party seeking to get the Board to defer).

*Electronic Reproduction,* 213 N.L.R.B. 758 (1974) overruled the *Collyer-Airco-Yourga* line of precedent. The Board adopted the position of the dissenting opinions in those cases. It held that where an unfair labor practice issue could have been brought to the attention of the arbitrator but was not, the Board would defer to the arbitrator's award unless there were unusual circumstances.

After much criticism by the courts and commentators, the Board once again reversed itself in *Suburban Motor Freight* and returned to the *Collyer-Airco-Yourga* standard. *Suburban Motor Freight* is the latest statement of the Board's policy:

> In specific terms, we will no longer honor the results of an arbitration under *Spielberg* unless the unfair labor practice issue before the Board was both presented to and considered by the arbitrator.

> We will give no deference to an arbitration award which bears no indication that the arbitrator ruled on the statutory issue of discrimination in determining the propriety of an employer's disciplinary actions.

Of course the Board may not adopt "a policy regarding deference to an arbitration and then blithely ignore it, thereby leading astray litigants who depended upon it." *NLRB v. Horn & Hardart,* 439 F.2d 674, 679 (2d Cir.1971). Nor can it enforce a policy in a manner calculated to reach a particular result in a particular case. But the Board may adopt a new policy and apply it consistently as to all parties. *Id. See also Liquor Salesmen's Union Local 2 v. NLRB,* 664 F.2d at 325; *Ad Art, Inc. v. NLRB,* 645 F.2d 669, 675 n. 2 (9th Cir.1980).

3. The Fourth Circuit appears to take a contrary view in *NLRB v. Motor Convoy,* 673 F.2d 734 (4th Cir.1982). It reasons, as the Board did in *Electronic Products,* that the Board's policy would encourage an employee not to bring his

See General Warehouse Corp., 643 F.2d at 970–71 n. 6; Stephenson, 550 F.2d at 540; Banyard, 505 F.2d at 347.

■ Applying this principle to the present case, we hold that the Board was correct not to defer to the arbitrator's award. The arbitrator's opinion gives no evidence that the unfair labor practice charge was considered by the arbitrator.[4] The ALJ found that, though Knutson and the Union might have maintained that her discharge was due to her union activities, the arbitrator did not consider them.

Even if Knutson had been guilty of insubordination and there was just contractual cause for her discharge, she still might have been fired in part because of her union activity. NLRB v. General Warehouse Corp., 643 F.2d at 970; St. Luke's Memorial Hospital, Inc. v. NLRB, 623 F.2d 1173, 1179 (7th Cir.1980); Ad Art, Inc. v. NLRB, 645 F.2d 669, 677 (9th Cir.1980); Stephenson v. NLRB, 550 F.2d 535 at 539. Nowhere in his opinion does the arbitrator find that Knutson would have been fired even if she had

not been an active member of the union. This point is the crux of the statutory issue, and we will not presume that the arbitrator's award makes such an implicit finding. Moreover, the statutory issues and the contractual issues are not congruous enough to order deferral in this case. Compare Bloom v. NLRB, 603 F.2d at 1021. Thus the Board did not abuse its discretion in deciding to consider Knutson's unfair labor charges.[5]

## BOARD'S FINDINGS

The Company contends that even if deferral was not mandatory, the Board's findings that Knutson was fired because of her union activity is not supported by substantial evidence on the record. We disagree.

The Company argues that the Board's "in part" analysis is an impermissible exercise of its authority to adjudicate unfair labor practices. The Board adopted its present policy in Wright Line, Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced 662 F.2d 899 (1st Cir.1981), cert. de-

---

or her unfair labor charges before the arbitrator. Therefore, if the arbitrator decided the contractual issue adverse to the employee, he or she would then be able to invoke the processes of the Board to resolve the statutory issue.

This analysis overlooks two critical factors. First, if the unfair labor practice is congruous with or dependent upon the contractual issue, the Board may be required to defer because the issue has already been decided. Under the Board's deferral policy, the Board is not to substitute its judgment for that of the arbitrator on the contractual issue. See, e.g., Liquor Salesmen's Union Local 2 v. NLRB, 664 F.2d at 325 (congruence of interests); Bloom v. NLRB, 603 F.2d 1015, 1021 (D.C.Cir.1979) (requisite congruence between the contractual and statutory issues).

Second, if the statutory and contractual issues are not the same, it may be entirely appropriate that the statutory issue be decided by the Board. By balancing the public interest in efficient resolution of labor disputes against the right of the parties to have their dispute settled by a competent body, the Board has ample discretion to avoid the needless relitigation of issues.

4. The discussion section of the arbitrator's award states his conclusions in a summary manner:

Discussion

This case, being a disciplinary matter, the Company had the burden of proving that the grievant's conduct was just cause for discharge. The contract provided (sic) therefore (sic) in Article 4 as to violation of Company rules.

It was the sole duty of Arbitrator to determine from the evidence submitted whether the company had borne its burden of proof. The Arbitrator concludes from all the evidence, its nature and type, the demeanor of the witnesses, their opportunities for observation of grievant's work conduct [,] their self serving interest or otherwise, and the work record of grievant.

The Arbitrator concludes therefore that the Company has sustained its burden of proof and that the grievant was guilty of insubordination (Shop Rule # 16) and that the Company had just contractual cause for discharge.

(Emphasis in original.)

5. The Board's decision whether to defer is reviewable for abuse of discretion. Liquor Salesmen's Union Local 2 v. NLRB, 664 F.2d at 326 n. 3; NLRB v. General Warehouse Corp., 643 F.2d 965, 970 (3d Cir.1981); NLRB v. International Longshoremen's & Warehousemen's Union & Local 27, 514 F.2d 481 (9th Cir.1975).

*nied* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).[6]

Our court has approved the *Wright Line* method of proof in several cases since its adoption by the Board. *See Republic Die and Tool v. NLRB,* 680 F.2d 463 (6th Cir. 1982); *Borel Restaurant Corp. v. NLRB,* 110 L.R.R.M. 2799 (6th Cir.1982); *NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442 (6th Cir.1981); *NLRB v. Consolidated Freightways,* 651 F.2d 436 (6th Cir.1981). The analysis, patterned on the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), is one acceptable method of adducing evidence on the controlling motivation of an employer when he has more than one motivation for discharging an employee, at least one of which is impermissible. In *Republic Die and Tool,* 680 F.2d at 465, we sanctioned the *Wright Line* test as a "mechanical means of balancing the employee's rights under the Act and the employer's right to discharge an employee for proper cause."

The Board's balancing under the *Wright Line* test properly protected both interests in this case. The Board conducted a de novo analysis of whether Knutson had been fired in part because of her union activities. It found that the General Counsel had made a prima facie showing of unlawful disciplinary actions against Knutson on June 8, June 26, and July 11, 1978. Furthermore, it found that the Company had failed to meet its burden of proving that the same disciplinary actions would have been taken if Knutson had not been an active member of the union.

■ We have considered the Company's arguments that the Board erred in its credibility assessments and findings of fact. This court will not normally disturb the credibility assessments of the Board or the Administrative Law Judge who has observed the demeanor of the witnesses. *NLRB v. Cement Transport, Inc.,* 490 F.2d 1024, 1029 n. 5 (6th Cir.), *cert. denied* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). In this case, the ALJ made detailed findings on the credibility of the major witnesses. He discounted some of Knutson's testimony because he found her manner while testifying to be affected. We decline to substitute our judgment for the ALJ who viewed the witnesses.

■ Our review of the evidence is limited to whether substantial evidence in the record as a whole supports the Board's findings. *Universal Camera Corporation v. Labor Board,* 340 U.S. 474, 481, 71 S.Ct. 456, 460–61, 95 L.Ed. 456 (1951); *NLRB v. Cement Transport,* 490 F.2d at 1027; *NLRB v. Howell Automatic Machine Company,* 454 F.2d 1077 (6th Cir.1972); *NLRB v. Stemun Manufacturing Company,* 423 F.2d 737 (6th Cir.1970). The Board's findings justify its conclusion that Knutson was discharged, at least in part, because of her union activity and her sex discrimination action.

We affirm the Board's holding that Knutson's filing of personal grievances, as well as her actions on June 8, were concerted action protected by the Act. *See NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d at 445. Moreover, we affirm the finding that the Company committed an unfair labor practice when it counted days against Knutson for purposes of discipline when she was absent from work attempting to vindicate her rights under Title VII. *Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978).

---

**6.** In *Wright Line, Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), the Board articulated the analysis it will use in cases where an employer might have more than one motivation for disciplining an employee. The General Counsel has the initial burden of proving a prima facie case by showing that an improper motive tainted the employer's decision. The burden then shifts to the employer to show that the employee would have been disciplined in the same manner without the improper motive.

The First Circuit enforced the Board's *Wright Line* decision, 662 F.2d 899 (1st Cir.1981), but it refused to sanction all of its analysis. According to the First Circuit, the burden that shifts to the employer is merely that of coming forward with evidence of his actual motivation. The ultimate burden of persuasion rests with the employee in that Circuit.

Accordingly, we affirm the Board's order and grant the Board's application for enforcement.

MERRITT, Circuit Judge, dissenting.

Because I believe that the majority unjustifiably restricts the use of arbitration, I respectfully dissent.

As the majority observes, the question of deferral by the National Labor Relations Board to arbitration awards has created a split in the circuit courts. On the one hand, the Third, Ninth and District of Columbia Circuits have shown a decided reluctance to compel deferral. *See NLRB v. General Warehouse Corp.*, 643 F.2d 965 (3d Cir. 1981); *Stephenson v. NLRB*, 550 F.2d 535 (9th Cir.1977); *Banyard v. NLRB*, 505 F.2d 342 (D.C.Cir.1974). On the other side, the Fourth Circuit has taken a much more expansive view of the *res judicata* effects of arbitration. *See NLRB v. Motor Convoy, Inc.*, 673 F.2d 734 (4th Cir.1982).

In *Motor Convoy, supra*, the collective bargaining agreement that constituted the basis for arbitration explicitly prohibited the company from discharging workers for union activities. The court accordingly held that the statutory unfair labor practice issue and the contractual discharge issue were identical: "Resolution of one is necessarily a resolution of the other." *Id.* at 736. Similarly, the contract in the instant case provided that:

There shall be no discrimination . . . in regard to . . . discharges, or other conditions of employment as set up in this Agreement on account of . . . union activity . . . .

In order for the arbitrator to conclude that the company had "just contractual cause" to discharge Vivian Knutson, he was required to consider whether *any* "unjust" cause—including union activity—in fact prompted the discharge.

The majority imposes a rule that directly contradicts the Supreme Court's admonition regarding arbitration of labor disputes. It holds that "any doubts regarding the propriety of deferral will be resolved against the party urging deferral," whereas in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960)—the second case in the landmark *Steelworkers Trilogy*—the Supreme Court stated:

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage.* [emphasis supplied]

The Supreme Court's willingness to establish a clear presumption in favor of arbitration reflects the sound purpose of ensuring the availability and finality of that dispute resolution device to the participants in the collective bargaining process. In the final *Steelworkers Trilogy* case, the Supreme Court reiterated its intention to preserve the finality of arbitration decisions. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Citing that case in his dissent from the Third Circuit's holding in *General Warehouse Corp., supra*, Judge Aldisert observed that "the Supreme Court has ordered the federal judiciary and the federal administrative agencies to avoid nit-picking arbitral opinions, thereby diluting the power of arbitrators and discarding the finality due consensual arbitration." *Id.* at 965 (Aldisert, J., dissenting).

Moreover, the majority's rule encourages litigants like Knutson to withhold their unfair labor practice claims from arbitration proceedings and thereby preserve a "second bite" before the Board, should the arbitrator's decision prove unsatisfactory. Arbitration thus becomes "nothing more than a costly extra step in the march to federal court rather than the cost efficient and rapid resolution of disputes it is designed to be." *Motor Convoy, supra*, at 736–37. It is worth noting that in the instant case, Knutson did not file her unfair labor practice charges until the very day of the adverse arbitration decision.

In direct opposition to the majority, I would adopt the rule that where, as here, unfair labor practice charges and a wrongful discharge challenge arise from the same set of occurrences, the Board should presume that the arbitrator considered both sets of issues in reaching his ultimate decision. Provided the remaining *Spielberg* criteria are met, the Board should then defer to the arbitrator's decision. Such a rule would further the national policy of obtaining the swift and final resolution of labor disputes.