KEELER CORP., d/b/a Keeler Brass Co., Petitioner-Appellant,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee.

Nos. 82–1565, 82–1694.

United States Court of Appeals, Sixth Circuit.

Oct. 3, 1983.

Gary P. Skinner, Varnum, Riddering, Wierengo & Christenson, John Patrick White, argued, Grand Rapids, Mich., for petitioner-appellant.

Elliott Moore (Miriam Szapiro, argued), Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-appellee.

Before KRUPANSKY and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

### ORDER

This is an appeal by Keeler Brass Co. (Keeler) from an Order of the National Labor Relations Board (NLRB) which found that Keeler had violated the National Labor Relations Act (NLRA) (1) by promising benefits to an employee if he disaffiliated with the union, (2) by demoting the employee, and (3) by denying him a promotion. While Keeler contests all three purported violations, the sharpest dispute concerns the allegedly withheld promotion, which the ALJ concluded was properly awarded to another employee but which the full NLRB decided was resolved by an unfair labor practice.

The present matter originated in an organizing campaign by the UAW at Keeler Brass in February, 1979. This union drive closely followed the October, 1978 reorganization of Keeler's tool & die department by which some employees at Keeler's Stevens Street plant were transferred to a subsidiary, Select Die Corp. The Stevens Street foreman, Joseph Curtis (Curtis), rated all employees to determine who should go to Select Die and who should remain at Stevens Street. The employee here at issue, Gordon Stroven (Stroven), was not transferred to a higher paying job at Select Die, but, as one of the most senior employees left at Stevens Street, was asked to "fill in" for the transferred assistant foreman.

Stroven continued to function as a temporary assistant foreman during 1979 except for periods during February and March when he was absent due to a job-related injury. During such absences, an employee named Ray Berens (Berens) "filled in" as assistant foreman at Stevens Street. It is critical to note that Berens, who had ranked above Stroven in an independent evaluation completed by foreman Curtis as part of the 1978 corporate reorganization, also scored higher than Stroven in a comparable May, 1979 evaluation by new foreman Garner Hall (Hall). Moreover, Berens' superiority was most pronounced in areas involving understanding of all the jobs in the plant, not simply the employee's skill at his own position.

Subsequent to the completion of an in-house training course for supervisors in July, 1979, all the participants but Strovens received a 24-cent per hour pay increase. Although Foreman Hall and Plant Manager Briggs later testified that this pay decision regarding Stroven reflected their mutual conclusion in May, 1979 that Berens was to be the permanent assistant foreman, they told Strovens at the time that no decision on the promotion would be made until November. Apparently angered by this re-

sponse to his inquiry, Stroven contacted the union, agreed to serve on the organizing committee, and reported for work on August 29 in a union t-shirt. Plant manager Briggs phoned Keeler's industrial relations director Donald Marsh (Marsh) about this incident and Marsh visited the plant to observe Stroven's attire, although nothing was said to Stroven at that time.

With the final election scheduled for September 12, company officials commenced a series of "meetings" with groups of employees to speak about the vote and take questions. Subsequent to a September 6 discussion, Marsh approached Strovens, took him to a private office and asked him to explain his union sympathies. Stroven related his dismay at not receiving the pay increase upon completion of the supervisor training program. Marsh immediately called in plant manager Briggs who stated, according to Stroven, that when he saw Stroven in a union t-shirt "My plans [for you] went right down the drain." Marsh suggested that Strovens disavow support for the UAW in writing and then "all will be forgotten." [Marsh and Briggs recall this meeting as being on August 29, the date Stroven first displayed union support, and both managers recall only that they conveyed, in vague terms, their concern that certain employees were ungrateful for opportunities and were "messed up". The ALJ credited Stroven's version.]

On September 15, three days after the balloting, foreman Hall was to be absent for dental treatment. Hall asked Briggs who should serve as temporary foreman at that time and was told to designate Berens because the company "didn't want an assistant foreman that was a union organizer." Stroven received a similar response from Hall who told Stroven to think about "that show you put on the last two weeks". Effective November 4, 1979, Berens was permanently assigned acting assistant foreman.

On this record, the ALJ found "no difficulty" in holding that Keeler committed unfair labor practices by promising Stroven that "all would be forgotten" if he disowned his prior union support and by deny-

ing Stroven the opportunity to serve as acting assistant foreman on September 15 when Hall was at the dentist, in that no permanent assistant was then designated and the stated reason for excluding Stroven on that day was "that show [he] put on" during the union organizing drive. However, the ALJ determined that the promotion to permanent assistant was a "more perplexing issue" upon which the NLRB's "evidence as a whole is simply not sufficiently convincing". The ALJ stated:

I first readily credit Stroven in regard to his testimony of being badgered by both Marsh and Briggs on September 6 about his partisanship and its possible consequences. Yet even given such indefensible dismay a larger background must be looked to. The first factor is that a 1-year cycle was in effect to settle out the tool room's upheaval as many of its skilled tool-and-die makers departed. New personnel came in, the old supervisor left and a younger one assumed its management for the first time. Superior evaluations had been rendered on Berens by two different foremen, totally free of any tainted considerations, and it is reasonable to believe that he attended the supervisory training course to better equip himself for possible selection just as Stroven was scheduled to attend to better acquit himself during random spells of leadership. Further, Berens was no stranger to the process having performed as acting assistant foreman for numerous hours as recently as much of July and into early August. While I discredit Hall's testimony and that of Briggs' to the effect that a final *decision* on the matter had been made back in May, contrarily I see several definite leanings toward Berens in terms of his proficiency and reliability of attendance that were latently present at all times. A final factor, although such things are not necessarily equatable, is that Roberson, a person also identified as affiliating with the Union, became official back-up to Berens from and after November.

(Footnotes omitted).

In its final action, the NLRB accepted the ALJ's report as to the promise to "for-

get" Stroven's union activity if he would recant and the loss of the September 15 opportunity to serve as assistant foreman, but the Board reversed the ALJ on the issue of the permanent appointment. Accordingly, the Board Ordered Stroven named to the permanent acting assistant foreman position with compensation at the rate of that position from September 15 to November 3, 1979. The Board also directed Keeler to post a non-discrimination notice and to cease and desist from unfair practices.

This Court's review of factual findings is limited to a determination of substantial evidence in the record, considered in its entirety, which is supportive of the Board's findings. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 481, 71 S.Ct. 456, 560–61, 95 L.Ed. 456 (1951); *N.L.R.B. v. Magnetics Int'l., Inc.,* 699 F.2d 806 (6th Cir.1983). Substantial evidence has been defined as more than a "mere scintilla" but less than a preponderance. *Moore v. Califano,* 633 F.2d 727 (6th Cir.1980). Applying this standard, the Court may consider the body of evidence opposed to the Board's conclusion, but may not "set aside the Board's choice between two conflicting views of the evidence if it is supported by substantial evidence, even though the court might have reached a different conclusion if the matter had been before it *de novo.*" *Jim Causley Pontiac v. N.L.R.B.,* 620 F.2d 122, 123 (6th Cir.1980).

In the instant case, there is substantial evidence that Stroven was offered a potential benefit if he recanted his union support; any interpretation of the *quid pro quo* embodied in Marsh's comments which does not recognize that Stroven was being offered something of benefit to him in exchange for something of benefit to Keeler is not plausible. Further, the ALJ, upon evaluating the blunt anti-union remarks actually directed to Stroven when he *asked* about the loss of the September 15 opportunity to serve as assistant foreman, determined that the explanation now asserted concerning defective job performance is "a sham on its face and otherwise credibly denied." Indeed, the fact that the company told Stroven he could not function as assistant foreman that day because of his union activity, convincingly rebuts Keeler's position that another, unspoken reason actually existed.

However, there is an absence of such substantial evidence to support the conclusion that Stroven was denied the permanent position of assistant foreman because of his union activity. When, as here, there is evidence of both proper and improper motives for an employment action, the issue requires application of the so-called *Wright Line* test. *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, enf'd. 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). *Accord N.L.R.B. v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *N.L.R.B. v. Valley Plaza, Inc.,* 715 F.2d 237 (6th Cir., 1983). This test initially requires the Board to make a prima facie showing that protected conduct was the motivating factor in the employer's division. The "burden then shifts to the employer to establish that the discipline or discharge would have occurred in the absence of the protected activity." *Id.* at 241.

In the instant case, it is clear that the Board met its initial burden of making a prima facie case. It is equally clear that Keeler convincingly established that Stroven would not have been promoted in the absence of any protected activity. Simply put, the record contains clear uncontroverted documentary proof, not subject to disputes as to credibility, that Berens was more qualified for the supervisory job than was Stroven. The consistently superior ratings assigned to Berens by disinterested evaluations, emphasizing his ability to supervise all of the various jobs in the plant, are the most probative, relevant findings as to what "would have occurred in the absence of the protected activity". *Id.*

Accordingly, the Order of the Board is hereby ENFORCED in part and VACATED in part as hereinabove set forth.